1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**EASTERN DISTRICT OF CALIFORNIA**

6
7
8
9
10
11

| | |
|---|---|
| GLENDA M. LEWIS AND GLENN E. LEWIS, | 1:07-CV-00497-OWW-GSA |
| Plaintiffs, | ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 33) |
| v. | |
| MAMMOTH MOUNTAIN SKI AREA, | |
| Defendants. | |

12
13

### I.   INTRODUCTION

14        Plaintiff, Glenda M. Lewis, alleges she sustained injuries
15   while participating in a guided snowmobile tour offered by
16   Defendant, Mammoth Mountain Ski Area ("Defendant" or "Mammoth").
17   Doc. 25 at ¶ 16 First Amended Complaint ("FAC").  Plaintiffs' FAC
18   alleges (1) Defendant negligently conducted the guided
19   snowmobiling tour in which Plaintiff was allegedly injured; (2)
20   Defendant should be considered a common carrier and breached the
21   heightened duty of care owed by a common carrier to Plaintiff;
22   (3) Defendant negligently maintained its premises resulting in
23   Plaintiff's alleged injuries; (4) Defendant was grossly negligent
24   in conducting the guided snowmobile tour; and (5) Plaintiff,
25   Glenn E. Lewis, suffered loss of consortium as a result of his
26   wife's injuries.
27        Before the court for decision is Defendant's Motion for
28   Summary Judgment.  Doc. 33, Defendant's Motion For Summary

1

Judgment, filed Dec. 1, 2008.  Defendant seeks judgment on the entire FAC, arguing that: (1) Plaintiffs assumed the risks of snowmobiling on Defendant's property by (a) signing a written waiver and release; (b) under California's primary assumption of the risk doctrine, barring Plaintiffs' negligence and premises liability claims; (2) Defendant is not a common carrier; (3) Plaintiffs have produced no evidence that Defendant was grossly negligent; and (4) Plaintiff cannot establish Defendant is liable for loss of consortium.  Doc. 39, Defendant's Motion For Summary Judgment, filed Dec. 1, 2008.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant, Mammoth Mountain Ski Area, is a California corporation with its principal place of business in Mammoth Lakes, California.  FAC at ¶ 2.  Defendant owns and operates Mammoth Snowmobile Adventures ("MSA") which provides guests with guided snowmobile riding tours for a fee.  FAC at ¶ 5.

A snowmobile is a gasoline engine powered machine that runs on skis across snow-covered ground at speeds up to 60 miles per hour.  A snowmobile rider wears a seatbelt and helmet, but is otherwise exposed to potential physical injury from falling and impacting the terrain and any obstacles that may be encountered.

Plaintiffs, Glenda M. Lewis and Glenn E. Lewis, are residents of San Antonio, Texas.  FAC at ¶ 1.  Based on citizenship and amount in controversy, the diversity jurisdiction of the court is properly invoked.

On April 5, 2005, Plaintiffs signed up for a guided snowmobile tour with MSA.  FAC ¶ 6.  It is undisputed that

1  Plaintiffs paid a fee for the snowmobile tour and signed a

2  "Participant Agreement Release And Acknowledgment of Risk" (the

3  "Participant Agreement").  Doc. 48, Plaintiffs' Response To

4  Separate Statement of Undisputed Material Facts ("PUMF") at ¶ 2,

5  filed Jan. 23, 2009.  The text of the Participant Agreement

6  appears in 10-point Times New Roman font, while titles and other

7  language appear in 14-point and 16-point fonts.  Doc. 49,

8  Plaintiffs' Statement of Additional Material Facts ("PAMF") at ¶¶

9  13, 15.  Certain portions of the text appear in bold and/or are

10  italicized.  PAMF at ¶ 15.

11      The first page of the Participant Agreement reads in

12  pertinent part:

13          In Consideration of services of MAMMOTH SNOWMOBILE
            ADVENTURES,...I hereby agree to release and discharge "MSA"...as follows:
14

15          (1) I acknowledge that snowmobiling entails known and unanticipated risks
            which could result in physical or emotional injury, paralysis, death, or damage to
            myself, to property, or to third parties.  I understand that such risks simply
16          cannot be eliminated without jeopardizing the essential qualities of the activity.
            These risks include, but are not limited to: riding on uneven snow covered
17          terrain, changing snow conditions and variations in elevations....[MSA guides]
            might be ignorant of a participant's fitness or abilities.  They might misjudge the
18          weather, the elements, or the terrain.  They may give inadequate warnings or
            instructions....
19
            (2) I expressly agree and promise to accept and assume all of the risks existing in
20          this activity.  My participation in this activity is purely voluntary, and I elect to
            participate in spite of the risks.  I accept full responsibility for any damages or
21          injury of any kind arising out of the operation of said snowmobile.

22          (3) I hereby voluntarily release, forever discharge, and agree to indemnify and
            hold harmless "MSA" from any and all claims, demands, or causes of action,
23          which are in any way connected with my participation in this activity or my use
            of "MSA"'s equipment or facilities, including any such Claims which allege
24          negligent acts or omissions of "MSA"....

25  Doc. 38 (original font size and emphasis maintained), Defendant's
    Separate Statement of Undisputed Material Facts ("DUMF") at ¶ 3,
26  filed Dec. 1, 2008.

27  The second page reads in pertinent part:

28          By signing this document, I acknowledge that if anyone is hurt or property

                                3

> is damaged during my participation in this activity, I may be found by a court of law to have waived my right to maintain a lawsuit against "MSA" on the basis of any claim from which I have released them herein.
>
> I have had sufficient opportunity to read this entire document. I have read and understood it and I agree to be bound by its terms.

*Id.* (original font size and emphasis maintained).

Both plaintiffs read the entire release prior to signing it.[1]  Glenn. Depo. at 106.

The MSA tour was led by MSA guide, Chris Hosking. Mr. Hosking has been a snowmobile tour guide with MSA for seven years.  DUMF at ¶ 13.  He estimates that during his tenure with MSA he guided over 8,000 guests and rode over 40,000 miles of snow-covered terrain.  DUMF at ¶ 20.

Each year, MSA trains new and returning guides.  DUMF at ¶ 16.  MSA manager, Robert Colbert, conducts a two-day seminar training in which he instructs the guides on tour operation, guest interaction, guest safety, and MSA policies and procedures. DUMF at ¶ 16.

On April 5, 2005, Mr. Hosking instructed Plaintiffs, and other participants, on how to operate the snowmobile during a brief orientation prior to the tour.  Glenn Depo. at 25. Plaintiffs did not ask Mr. Hosking any questions during or after the orientation.  Glenn Depo. at 28.  Plaintiffs recall that Mr. Hosking did not provide instruction on how to handle becoming airborne and that he failed to provide additional instruction on off-trail snowmobile riding.  PAMF at ¶ 5.

---

[1] Glenn recalls spending three minutes reading the release. Glenn Depo. at 106.  Glenn recalls Glenda taking ten minutes to read the release.  Glenn Depo. at 106.

**4**

After the orientation session, Plaintiffs, along with the rest of the tour group, departed on their guided tour. Plaintiffs rode together on one snowmobile: Mr. Lewis drove the snowmobile while Mrs. Lewis rode as a passenger behind Mr. Lewis. DUMF at ¶ 5.  It is undisputed that each rider participating in the snowmobile tour controlled his or her snowmobile at all times: specifically, through the snowmobile's throttle, brake, and handlebars.  DUMF at ¶¶ 8-11.  Defendant states that each rider was at liberty to choose his or her own path.  DUMF at ¶ 12.  However, Plaintiffs believe that riders participating in the tour were not free to go in any direction at any time.  PAMF at ¶ 12. Rather, Plaintiffs state that Mr. Hosking led the tour group, decided both the on-trail and off-trail routes, and that Mr. Hosking set the pace for travel.  PAMF at ¶¶ 9-12.

Initially, Mr. Hosking led the group along established trails.  Glenn Depo. at 28.  Later in the tour, Mr. Hosking asked the group if they would like to go "off trail".  Glenn Depo. at 37-38.  Several members of the group answered affirmatively; however, Plaintiffs remained silent and followed the group off trail.  Glenn Depo. at 38.

It is undisputed that while off trail, Plaintiffs encountered a windridge, which is caused by "wind blowing snow and building a hump and an eddy."  DUMF at ¶ 7.  Defendant states that the windridge in question here was a two to three foot variation in terrain.  DUMF at ¶ 6.  However, Plaintiffs' witnesses recall the drop being closer to three to six feet. PUMF at ¶ 6.  Plaintiffs went over this windridge, which in turn caused them to become airborne.  DUMF at ¶ 6.  Upon landing, Mrs.

**5**

Lewis sustained injury.  DUMF at ¶ 6.

Mr. Lewis heard Mrs. Lewis yell out and immediately pulled the snowmobile over and checked on Mrs. Lewis.  Mr. Lewis discovered that she was in a lot of pain and subsequently summoned Mr. Hosking.  Glenn Depo. at 52.  Mr. Hosking recommended calling ski patrol so that Mrs. Lewis could be evacuated by toboggan.  Glenn Depo. at 52.  However, Mrs. Lewis refused treatment and rode the snowmobile, as a passenger, back to the MSA base where she then sought medical attention.  Glenn Depo. at 52.

Mrs. Lewis filed suit in this court on March 29, 2007 seeking damages for injuries sustained while snowmobiling on the MSA tour.  Mr. Lewis joined her suit alleging loss of consortium resulting from Glenda's injuries purportedly caused by Defendant.

### III.  DECISIONAL STANDARDS

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. Pro. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material.  *Id*.  A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.   *See Triton Energy Corp. v. Square*

**6**

*D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  The evidence must be viewed in a light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products, Inc.*, 268 F.3d 639, 644 (9th Cir. 2001), *amended by* 2001 WL 1490998 (9th Cir. 2001).  Facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *Triton Energy Corp.*, 68 F.3d at 1221.  The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  *Devereaux*, 263 F.3d at 1076.

[T]he plain language of Rule 56(c) mandates the

**7**

> entry of summary judgment, after adequate time
> for discovery and upon motion, against a party
> who fails to make a showing sufficient to
> establish the existence of an element essential
> to the party's case, and on which that party
> will bear the burden of proof at trial.  In such
> a situation, there can be "no genuine issue as
> to any material fact," since a complete failure
> of proof concerning an essential element of the
> nonmoving party's case necessarily renders all
> other facts immaterial

*Celotex Corp.*, 477 U.S. at 322-23.

"In order to show that a genuine issue of material fact exists, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Rivera v. AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249).  If the moving party can meet his burden of production, the non-moving party "must produce evidence in response....[H]e cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."  *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  "Conclusory allegations unsupported by factual data cannot defeat summary judgment."  *Rivera*, 331 F.3d at 1078 (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)).

## IV.  <u>DISCUSSION</u>

### A.  <u>Negligence Claim - Assumption of Risk</u>

Defendant moves for summary judgment on Plaintiffs' negligence claim, arguing that (1) Plaintiffs waived their right to sue on a negligence theory by signing the Participant Agreement; and, alternatively, (2) that California's primary

assumption of the risk doctrine precludes negligence liability as a matter of law in this case.

The issue of assumption of the risk is a question of law, which may properly be decided on a motion for summary judgment. *See Knight v. Jewett*, 3 Cal. 4th 296, 313 (1992); *Muchhala v. United States*, 532 F. Supp. 2d 1215, 1228 (E.D. Cal. 2007) (citing *Knight* and deciding issue of primary assumption of risk on summary judgment); *Randall v. Mammoth Mountain Ski Area*, 63 F. Supp. 2d 1251, 1253 (E.D. Cal. 1999) (same). Both express assumption of the risk and primary assumption of the risk are amenable to summary adjudication. In the context of express assumption of risk, *Knight* stated that "as a result of an express agreement, the defendant owes no duty to protect the plaintiff from injury-causing risk." *Id.* at 308 n.4. Comparably, when primary assumption of the risk applies, the defendant owes no duty to protect the plaintiff from harm. *Id.* Where no duty exists, the plaintiff "is not entitled to recover from the defendant." *Id.*

### 1. Express Assumption of Risk

"Express assumption of risk is a contractual matter and comes into play where the plaintiff, in advance, expressly 'agrees not to expect the potential defendant to act carefully....'" *Saenz v. Whitewater Voyages, Inc.*, 226 Cal. App. 3d 758, 762-63 (1991). It also applies "when a person implies consent to certain risks by voluntarily encountering a known danger." *Id.* at 762. The doctrine arises when an express agreement "operates to relieve the defendant of a legal duty to the plaintiff with respect to the risks encompassed by the

agreement." *Knight*, 3 Cal. 4th at 308 n.4.[2]  It acts as a complete bar to recovery in a negligence action.  *Von Beltz v. Stuntman, Inc.*, 207 Cal. App. 3d 1467, 1477 n.3 (1989).

It is undisputed that both Plaintiffs read and signed the Participant Agreement.  However, Plaintiffs challenge the enforceability of the Participant Agreement by asserting (a) that the Participant Agreement failed to specify the risk of becoming airborne and therefore does not cover the injury sustained by Mrs. Lewis; (b) the font size of the Participant Agreement rendered it unreadable; (c) language in the Participant Agreement unrelated to release of liability was emphasized in capitalized and/or italicized fonts which detracted from the release language; and (d) that Plaintiffs only agreed to assume the risks of a beginners tour.  Doc. 47, Plaintiffs' Opposition To Motion For Summary Judgment at 10, filed Jan. 23, 2009.

a. *Specificity of MSA's Participant Agreement*

To be effective, a release from liability must "be clear, unambiguous, and explicit" and "express an agreement not to hold the released party liable for negligence."  *Nat'l & Int'l Bhd. of ("Street Racers") v. Superior Court*, 215 Cal. App. 3d 934, 938 (1989).  The release "need not achieve perfection."  *Id.*  It

---

[2] **California courts have consistently upheld release agreements in the recreational setting and have determined that such release agreements are not contrary to public policy.  *Allan v. Snow Summit, Inc.*, 51 Cal. App. 4th 1358 (1996) (upholding written release in the context of a snow sport over unconscionability objection); *see also City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 759 (2007) ("Our lower courts have upheld releases of liability concerning ordinary negligence related to ...[numerous] recreational activities.")**

"must be clear, explicit and comprehensible in each of its essential details" and "read as a whole, must clearly notify the prospective releasor ... of the effect of signing the agreement." *Paralift, Inc. v. Superior Court*, 23 Cal. App. 4th 748, 755 (1993) (citing *Madison v. Superior Court*, 203 Cal. App. 3d 589, 597-98) (internal quotations omitted).  Plaintiffs argue that the Participant Agreement failed to specify the risk of becoming airborne.[3]

In *Buchan v. U.S. Cycling Federation*, 227 Cal. App. 3d 134, 136-37 (1991), plaintiff sustained head injuries when she collided with other cyclists during a bicycle racing series and fell.  Although she signed an "Agreement and Release of Liability," the release did not specify what risks were in involved in cycling.  *Id.* at 145.  Instead, the release merely stated that "cycling is an inherently dangerous sport."  *Id.*  The court determined that "[f]alls and crashes [were] acknowledged risks of injury inherent in the sport of bicycle racing."  *Id.* at 148.  Since the injury arose from risks inherent in cycling, of which the plaintiff was aware when she signed the release, the court found the release enforceable.  *Id.* at 154.

In *Bennett v. U.S. Cycling Federation*, 193 Cal. App. 3d 1485, 1487-88 (1987), plaintiff was injured while participating

---

[3] At oral argument, Plaintiffs' counsel also argued that Mr. and Mrs. Lewis only assumed the risks associated with a "beginner's ride" or a "baby ride."  However, Plaintiffs offered no evidentiary or legal support for this assertion.  Case law suggests that the key legal inquiry is whether the risks encountered by Plaintiffs were within the scope of the release and related to the activity of snowmobiling.

in a bicycle race conducted and sponsored by the defendant.   In contrast to *Buchan*, the plaintiff in *Bennett* collided with a <u>vehicle</u> that was driven onto the race's closed-course with defendant's permission.   *Id.* at 1488.   Prior to beginning the race, the plaintiff filled out and signed defendant's "Entry Blank and Release," which waived plaintiffs' right to sue for defendant's negligent conduct or for injuries arising from participating in bicycle racing.   *Id.* at 1488.   The plaintiff challenged the validity of the release because it did not include the unexpected risk that caused plaintiff's injury.   Plaintiff argued that he did not expect vehicles on the closed-course, nor did the release contain any language purporting to warn the plaintiff of the hazard of encountering vehicles on the course. *Id.*

The court concluded that the injury sustained by the plaintiff due to the vehicle colliding with him during the race was outside the scope of the release.   *Id.* at 1491: "There is little doubt that a subscriber of the bicycle release at issue here must be held to have waived any hazards relating to bicycle racing that are obvious or that might reasonably have been foreseen."   *Id.* at 1490.   Such hazards include "collisions with other riders, negligently maintained equipment, bicycles which were unfit for racing but nevertheless passed by organizers, [and] bad road surfaces."   *Id.* (internal quotes omitted). Because the race was conducted on a closed-course, presence of and collision with a vehicle on the course was unrelated to bicycle racing and was not obvious or reasonably foreseeable to participants.   *Id.* at 1490-91.

12

1     In this case, the Participant Agreement is extremely broad
2  as to time and place for any activities arising out of
3  participating in snowmobiling.  It provides that "snowmobiling
4  entails known and unanticipated risks which could result in
5  physical or emotional injury, paralysis, death, or damage to
6  myself, property, or to third parties."  The agreement provides
7  specific examples of risks inherent in snowmobiling: "riding on
8  uneven snow covered terrain, changing snow conditions and
9  <u>variations in elevations</u>; lost participants; tree, rocks and
10 other man-made or natural obstacles; exposure to the elements,
11 extreme temperatures, inclement weather and encounters with
12 animals and wildlife; mechanical and/or equipment problems, and
13 unavailability of immediate medical attention in case of injury."
14 (emphasis added)  Plaintiffs correctly point out that the
15 agreement does not specify the risk of becoming airborne.

16    Although the risk of becoming airborne is not specified in
17 the release, the risk of variations in terrain is explicitly
18 identified.  A variation in elevation involves a change in the
19 height of ground level.  Common sense informs that when a
20 snowmobile, running on the surface of the ground, encounters an
21 abrupt change in elevation that the vehicle is likely to leave
22 the ground surface as it travels from higher to lower ground
23 levels.  A windridge two to six feet higher than the adjacent
24 ground level, is a variation in terrain, which caused Plaintiffs'
25 snowmobile to leave the higher elevation and become airborne.
26 The specific consequences of becoming airborne were not
27 articulated among the inherent risks; however, the risk of injury
28 caused by a variation in terrain, was disclosed.  Coming into

contact with a variation in elevation is a risk inherent in
snowmobiling, just as colliding with other cyclists is inherent
in bicycle racing.  *See Buchan*, 227 Cal. App. 3d at 148.  The
release here, like in *Buchan*, describes and makes the participant
aware that the activity in which they are about to engage has
inherent risks; i.e., of injury riding an open vehicle on snow
and uneven terrain.  Where a participant in an activity has
expressly released the defendant from responsibility for the
consequences of any act of negligence, "the law imposes no
requirement that [the participant] have had a specific knowlege
of the particular risk which resulted in [the injury]."  *Madison
v. Superior Court*, 203 Cal. App. 3d 589, 601 (1988).

        The Participant Agreement in this case is even more specific
than the release upheld in *Buchan*.  Here, the Participant
Agreement articulates specific risks inherent in snowmobiling, in
contrast to the *Buchan* release which only stated that "cycling is
an inherently dangerous sport."  Each Plaintiff in this case read
and signed the agreement by which each "expressly agreed[d] and
promise[d] to accept and assume all of the risks existing in
[snowmobiling]."  Plaintiffs further released Defendant from "any
such Claims which allege negligent acts or omissions of MSA."
The Participant Agreement adequately informs and puts Plaintiffs
on notice of the risks involved in snowmobiling, as the
Participant Agreement's language expressly describes the risk of
the snowmobile encountering variations in elevation which caused
it to leave the ground surface and impact lower terrain with
force, which led to the injury sustained.

        This conclusion is supported by *Saenz v. Whitewater Voyages,*

**14**

*Inc.*, 226 Cal. App. 3d 758, 763 n.7 (1990), where a release was upheld that stated in general terms that the risks inherent in whitewater rafting include "hazards of and injury to person and property while traveling on rafts on the river, accident or illness in remote places without medical facilities, the forces of nature...."  The release was validated despite the fact that it did not explicitly refer to defendant's negligence, nor did it specify the risk of death or drowning.  *Id.* at 765.  These omissions from the release were described as "drafting imperfections," which did not render the release ambiguous.  *Id.* at 765 (internal quotes omitted).

Here, the absence of reference to the specific risk of becoming airborne does not render the agreement ambiguous, because the release explicitly describes the risks and dangers of injury from snowmobiling caused by elevation changes as here occurred.  The Participant Agreement includes plain language absolving Defendant from "negligent acts or omissions."

This case is unlike *Cohen v. Five Brooks Stable*, 159 Cal. App. 4th 1476 (2008), where plaintiff was injured participating in a horseback riding tour, when a guide, unexpectedly and without warning caused his horse to gallop, which, in turn, caused all the other horses on the tour to gallop, resulting in plaintiff's injury.  *Cohen* held the risk of injury suffered by the plaintiff was not within the scope of the release because "[n]othing in the Release clearly, unambiguously, and explicitly indicates that it applies to risks and dangers attributable <u>to respondent's negligence or that of an employee</u> that may not be inherent in supervised recreational trail riding."  *Id*. at 1489

15

(emphasis in original).  Here, in contrast, the release clearly and unambiguously covers errors and/or misjudgements "of a participant's fitness or abilities, ...the weather, the elements, or the terrain," and instances in which the guide gives "inadequate warnings or instructions...."  The Participant Agreement, unlike the agreement in *Cohen*, expressly covers negligence on the part of MSA's guides.

*Paralift, Inc. v. Superior Court*, 23 Cal. App. 4th 748, 756 (1993), holds that it is not necessary that a release include every imaginable risk or every specific act of potentially negligent conduct because "the law imposes no requirement that [the participant] have had a specific knowledge of the particular risk which resulted in his [injury]."  (citing *Madison v. Superior Court*, 203 Cal. App. 3d 589, 601 (1988) (internal quotes omitted)).  The Participant Agreement unambiguously expresses that serious inherent risks exist in snowmobiling and specifies several examples of such risks.  Plaintiffs read and signed the Participant Agreement, expressly assuming the risks involved in this hazardous recreational activity.  Neither Plaintiff claims to have any learning disability or perceptual deficits that prevented each from reading and understanding the release's language.

### b.   *Font Size of the Participant Agreement*

Plaintiffs challenge the Participant Agreement on the additional ground that its 10-point font size makes it unclear and ambiguous.  Plaintiffs' argument finds no support in the law.

*Link v. Nat'l Ass'n For Stock Car Auto Racing, Inc.*, 158 Cal. App. 3d 138, 141 (1984), articulated the general rule: "[a]n

16

express release is not enforceable if it is not easily readable." *Link* invalidated a release printed in 5½- point font and held that "the typeface size of ... crucial language in a release should be no smaller" than 8- to 10-point font.  *Id.* at 141-142; *but see Bennett v. U.S. Cycling Fed'n*, 193 Cal. App. 3d at 1489-90 (holding that 5½-point font does not render the release per se invalid).[4]

Here, it is undisputed that the Participant Agreement is written in 10-point font, a type size not so small as to render the release legally unenforceable.

### c.   *Relative Emphasis of Text*

Plaintiffs argue that the Participant Agreement is unenforceable because capitalized and/or italicized text in the agreement distracts a reader from focusing on the operative release language.  Plaintiffs cite *Leon v. Family Fitness Center (#107), Inc.*, 61 Cal. App. 4th 1227 (1998) which held that "[a]n exculpatory clause is unenforceable if not distinguished from other sections, if printed in the same typeface as the remainder of the document, and if not likely to attract attention because it is placed in the middle of a document."  *Id.* at 1232.

---

[4] Plaintiffs cite *Celli v. Sports Car Club of Am., Inc.*, 29 Cal. App. 3d 511, 521 (1972), which invalidated a release written in 6-point type.  Although the *Celli* court was critical of the type size used in the release, it did not decide the issue of whether public policy would permit enforcement of a release written in such small font.  *Id.* at 522.  Instead, the court invalidated the release because the language did not specifically release defendants from liability for "negligence."  *Id.* Critically, here, the font is 10-point, larger than the type criticized in *Celli*.  *Celli* does not help Plaintiffs' case. Here, the font is a size validated by *Link*.

However, *Leon* concerned a health club membership agreement that contained a release clause embedded within a longer agreement. *Id.* at 1232-33.   In contrast, MSA's Participant Agreement is a stand-alone release, distinguishable from the agreement in *Leon*.

An effective release from liability must "be clear, unambiguous, and explicit."   Further, "[s]ignificant release language must be readable, and should not be so encumbered with other provisions as to be difficult to find."   *Bennett*, 193 Cal. App. 3d at 1489.   Although *Bennett* did not find the release enforceable against the plaintiff, the court nevertheless determined that the release was "sufficiently conspicuous and legible," based on its finding the release language was "practically the only language on the document."   *Id.*   The release language did "not have to compete with other, less important information for the subscriber's attention."   *Id.* at 1489-90.

Here, Plaintiffs suggest that capitalized and italicized language on the second page in the Participant Agreement competes with the release language, distracting the subscriber. Plaintiff's editing expert, Meg Brookman, examined the Participant Agreement and testified that the "majority of the text of the [Participant Agreement] is in 10 point Times New Roman...font."   Doc. 52 at ¶ 5 Declaration of Meg Brookman In Opposition to Motion for Summary Judgment, filed Jan. 23, 2009. Brookman further testified that in a document written in 10-point font, "[i]t is dificult...to determine what, if anything, was bolded in the original or whether the copy procedure or something else might have lightened or darkened some of the print."   *Id.*

No party has produced an original copy of the Participant Agreement, but submit a photo-copy of the Participant Agreement signed by Plaintiffs.

Although Brookman testified that "[n]o part of the document is unequivocally in bold" it is evident that the language on the top of the second page is in bold 10-point Times New Roman font:

> By signing this document, I acknowledge that if anyone is hurt or property is damaged during my participation in this activity, I may be found by a court of law to have waived my right to maintain a lawsuit against "MSA" on the basis of any claim from which I have released them herein.
> I have had sufficient opportunity to read this entire document.  I have read and understood it and I agree to be bound by its terms.

Immediately following this statement is a date and signature block, which has "5 Apr 05" written into the spaces provided beside the signatures of Glenn E. Lewis and Glenda Lewis, respectively.  Next, two headings in capitalized bold-faced type appear on the second page: (1) "PARENT'S OR GUARDIAN'S ADDITIONAL INDEMNIFICATION" and (2) "PROPERTY DAMAGE INSURANCE POLICY."  Finally, the capitalized, bold-faced, and italicized language referred to by Plaintiffs appears one-third of the way down on the second page of the Participant Agreement and reads:

> "*I, THE UNDERSIGNED, HAVE READ AND UNDERSTAND THE INSURANCE AGREEMENT ABOVE.  I ACCEPT RESPONSIBILITY FOR AND AGREE TO PAY ALL DAMAGE I CAUSE TO ANY MACHINE INCLUDING PARTS AND LABOR NOT COVERED BY ADDITIONAL INSURANCE.*"

Other language pertaining to insurance policies is found below this statement.

Plaintiffs' argument that the relative emphasis of the aforementioned clauses unduly distract a subscriber lacks merit. The bold-faced language at the top of the second page, located directly above the signature block, does not distract the reader.

Rather, this language, and its typeface, emphasize the important terms that by signing the agreement, the subscriber waives his or her right to bring a lawsuit against Defendant for injury or property damages based on negligence.  Moreover, the capitalized and italicized language on the second page of the agreement does not de-emphasize the release language and the risks involved described on the first page of the document.  Like the agreement in *Bennett*, the release language embodies the entire agreement. The Participant Agreement is sufficiently conspicuous and legible.

### d.  *Assumed Risks of the Snowmobile Tour*

At oral argument, Plaintiffs' counsel suggested that both the express and implied assumption of the risk analysis should be informed by the fact that Mr. and Mrs. Lewis intended only to participate in a "beginners" or "baby" snowmobile tour.  Mrs. Lewis was 59 years old.  Neither had snow-mobiled before. Plaintiffs essentially argue that they only expressly assumed the risk associated with a beginners tour.

Whether a release bars negligence liability is a question of contractual agreement.  *See Appleton v. Waessil*, 27 Cal. App. 4th 551, 554 (1994).  Assuming, *arguendo*, that Plaintiffs and Defendants shared a mutual understanding that Plaintiffs were only participating in a beginners ride, the Participant Agreement does not reduce any such agreement to writing.  Even if Plaintiffs were able to present parol evidence of a separate oral or implied agreement to limit the liability release to only "beginner" activities, such evidence would only be admissible to explain ambiguous terms in the Participant Agreement, not to

contradict express terms or to "explain what the agreement was." *See Wagner v. Columbia Pictures Indus., Inc.*, 146 Cal. App. 4th 586, 592 (9th Cir. 2007) (quoting Justice Holmes' explanation that parol evidence is inadmissible to show that when the parties "said five hundred feet they agreed it should mean one hundred inches, or that Bunker Hill Monument should signify the Old South Church").

Here, the Participant Agreement required Plaintiffs to acknowledge that

> snowmobiling entails known and unanticipated risks which could result in physical or emotional injury, paralysis, death, or damage to myself, to property, or to third parties.  I understand that such risks simply cannot be eliminated without jeopardizing the essential qualities of the activity.  These risks include, but are not limited to: riding on uneven snow covered terrain, changing snow conditions and variations in elevations...[MSA guides] might be ignorant of a participant's fitness or abilities.  They might misjudge the weather, the elements, or the terrain. They may give inadequate warnings or instructions...

In addition, Plaintiffs agreed to "voluntarily release, forever discharge, and agree to indemnify and hold harmless 'MSA' <u>from any and all claims, demands, or causes of action, which are in any way connected with my participation in this activity</u> ... including any such claims which allege negligent acts or omissions of 'MSA'..." (Emphasis added).

Plaintiffs assertion that there was an agreement to limit the liability release to only "beginner" or "baby" activities directly conflicts with the broadly worded language of the release, which enumerates specific risks and consequences, including the risks and consequences of negligence in taking beginners off-trail, that caused Mrs. Lewis' injury.

       **e.**   *Conclusion - Express Assumption of the Risk*

The Participant Agreement is clear, unambiguous, and easily readable.  It explicitly waives Plaintiffs' right to pursue a negligence action against Defendant.  Defendant's motion for summary judgment as to the negligence claim on the ground of express assumption of the risk is GRANTED.

### 2.   Primary Assumption of Risk

In addition to the defense of express assumption of the risk, Defendant also argues that Plaintiffs' negligence claim is barred by the doctrine of primary assumption of the risk, which applies when a defendant has a duty to protect plaintiff from the risks inherent in an activity.  However, because Plaintiffs expressly assumed the risks involved in snowmobiling, it is not necessary to reach a decision as to the primary assumption of the risk doctrine.  *See Paralift, Inc. v. Superior Court*, 23 Cal. App. 4th 748, 750 (1993) (declining to decide issue of primary assumption of risk where express assumption of the risk applied).

### B.   Premises Liability Claim

Premises liability is based upon traditional negligence principles of duty, breach, and harm.  Courts have found that a "special relationship" exists between business proprietors and their patrons or invitees.  *See Rotolo v. San Jose Sports and Entertain.*, 151 Cal. App. 4th 307, 326 (2007).  This duty may include "a duty to take affirmative measures, either to prevent foreseeable harm from occurring to those using the premises, or to come to the aid of a patron or invitee in the face of ongoing

or imminent harm or danger." *Id.*  However, California courts have upheld releases purporting to waive premises liability actions.

In *Benedek v. PLC Santa Monica, LLC*, 104 Cal. App. 4th 1351, 1355 (2002), the plaintiff, a member of the defendant's health club, was injured while attempting to turn a televison set to face his direction.  The plaintiff could not bear the weight of the television as it began sliding off of its mount, injuring his knee.  *Id.*  The plaintiff filed a premises liability claim against the health club.

The defendant argued that the release of liability form signed by the plaintiff, as part of his membership agreement, barred plaintiff's action.  *Id.*  The release purported to waive "any responsibility for personal injuries ... by any MEMBER ... while on the ... premises, whether using exercise equipment or not."  *Id.* at 1354.  The court upheld the release, finding that the release "unambiguously, clearly, and explicitly released [the defendant] from liability for any injury [the plaintiff] suffered on hotel or spa premises, whether using exercise equipment or not," *Id.* at 1361; further: "A release of all premises liability in consideration for permission to enter recreational and social facilities for any purpose does not violate public policy." *Id.* at 1359 (citing *YMCA of Metro. Los Angeles v. Superior Court*, 55 Cal. App. 4th 22, 27 (1997)).

Here, the Participant Agreement releases Defendants from "any and all claims, demands, or causes of action, which are in any way connected with my participation in [snowmobiling] or my use use of [Defendant's] equipment or facilities."  The

Participant Agreement releases Defendant's from claims arising from use of Defendant's facilities, which include the equipment used and the grounds on which the tour operated.  The Participant Agreement is enforceable against Plaintiffs, the release serves as a complete bar to Plaintiffs premises liability claim. Defendant's motion for summary judgment on the premises liability claim is GRANTED.

### C.   Common Carrier Negligence Claim

California Civil Code Section 2168 defines a common carrier as "[e]veryone who offers to the public to carry persons, property, or messages... is a common carrier of whatever he thus offers to carry."  Common carriers are subject to a higher standard of care and "must use the utmost care and diligence" when acting as such.  Cal. Civ. Code § 2100.  Plaintiffs contend that Defendant is a common carrier subject to a heightened duty of care.

An agreement purporting to release a common carrier from liability for negligence is against public policy.  *Walter v. Southern Pacific G.*, 159 Cal. 769, 772 (1911).  That policy does not apply to a "private carrier."  *Saenz*, *supra*, at 764.  "Unlike common carriers, private carriers are not bound to carry any person unless they enter into an agreement to do so."  *Id.* at 764 n.8; *Samuelson v. Public Utilities Comp.*, 36 Cal. 2d 722, 730 (1951).

Certain types of recreational rides are considered common carriers.  For example, in *McIntyre v. Smoke Tree Ranch Stables*, 205 Cal. App. 2d 489, 490 (1962), the defendant conducted guided

mule tours, which took passengers in a mule train along scenic trails. *Id.* at 492.  The defendant in *McIntyre* argued that it was not a common carrier because the mules were not tied together, and plaintiff had control over the mule and held the reins. *Id.* at 492.  The court rejected this argument, focusing instead on the relationship between the plaintiff and defendant. *Id.*  The court noted:

> [D]efendant operated a mule train for the purpose of taking passengers over a designated route between fixed termini...; for a roundtrip fare...; chose the animals to be used for this purpose; furnished whatever equipment was necessary; selected the trail over which they were to travel; trained [the mules] to follow one another along this trail; and employed a guide to act as conductor.  The only reasonable conclusion to be drawn from these facts is that a person who paid a roundtrip fare for the purpose of being conducted by mule over the designated route between fixed termini, purchased a ride; that the defendant offered to carry such a person by mule along that route between these termini; and that the transaction between them constituted an agreement of carriage.

*Id.   See also Squaw Valley Ski Corp. v. Superior Court,* 2 Cal. App. 4th 1499 (1992)(ski resort chair lift facility is a common carrier); *Gomez v. Superior Court*, 35 Cal. 4th 1125 (2005)(operator of a roller coaster or similar amusement park ride is a common carrier).[5]

    Defendant attempts to distinguish *McIntyre* on the ground that, in that case, "[e]ach passenger was essentially at the

---

        [5]     Plaintiffs, citing *Gomez*, contend that the "critical factor" in classifying an entity as a common carrier is "whether the carrier acts gratuitously or is paid." Doc. 47 at 11.  But, nothing in *Gomez* suggests that this factor is more important than any other.  *Gomez* merely involved a case in which the central disputed issue was whether defendant was a "carrier of persons for reward."  35 Cal. 4th 1125.

mercy of whatever the mule chose to do...."  Doc. 84 at 12.
Here, by contrast, guests on defendant's snowmobile tour had
complete control over their vehicle:  "they could stop the
snowmobile when they chose; they could hit the brakes at any
time; they could go faster and slower at various parts of the
ride."  *Id*.  Mammoth further argues:

> Holding Mammoth's snowmobile operation [to be] a common
> carrier would be no different than finding a ski area
> who provides lessons to guests to be a common carrier.
> In such a situation, the ski area would provide the
> guide.  The ski area provides equipment (skis, boots,
> and poles).  The guide takes the skier on the mountain.
> The guide selects the route for the skier who has
> control over his speed, his direction, and his ultimate
> path of travel.  The described situation is no
> different than what Mammoth provides as a snowmobile
> operator.  It is simply not a common carrier.

*Id*.  Mammoth's reasoning is compelling.  *McIntyre*, a case decided
more than forty years ago, represents the outside edge of
California's common carrier jurisprudence.  It does not compel a
finding that Defendant is a common carrier under the
circumstances presented here.

Some cases draw a distinction between "common carriers"
(sometimes referred to as "public carriers") and "private
carriers," placing into the latter category operators who are
"not bound to carry any person for any reason unless they enter
into an agreement to do so."  *Saenz, supra*, at 764 n.8; *see*
*Webster v. Ebright*, 3 Cal. App. 4th 784, 787 (1992) (holding
defendant, an owner and operator of recreational horseback rides,
to be a private carrier and reasoning that "being a carrier for
reward does not itself impose the 'utmost care' standard of
common carriers").  Defendant falls under this definition of

"private carrier," because MSA is not bound to guide anyone on a snowmobile tour unless they enter into a mutual agreement to do so.  Additionally, the tour did not operate between previously selected fixed termini and there is no evidence that guides always took the same fixed route, as the mule train in *McIntyre* did.  Each snowmobile was operated by an individual rider without any indication that the tour was to travel a pre-established fixed route.  This was a specific agreement for private carriage with a comprehensive release of MSA from negligence.[6]

Moreover, even if Defendant were a common carrier, the Participant Agreement bars any negligence claim based on a heightened common carrier duty of care.  *Booth v. Santa Barbara Biplanes, LLC*, 158 Cal. App. 4th 1173, 1177 (2008), held that a common carrier my limit its liability by special contract or release, but not for gross negligence.  *See* Cal. Civ. Code § 2174 ("obligations of a common carrier ... may be limited by special contract"); Cal. Civ. Code § 2175 ("a common carrier cannot be exonerated, by any agreement...from liability for the gross negligence, fraud, or willful wrong of himself or his servants").

---

[6]   There is some authority that suggests the higher standard of care set forth in § 2100 applies only to common/public carriers, not private carriers.  *See Webster v. Ebright*, 3 Cal. App. 4th 784, 787 (1992).  However, the law is far from clear on this question.  *See Lopez v. So. Cal. Rapid Transit Dist.*, 40 Cal. 3d 780, 785 (1985) (stating "[t]he duty imposed by Section 2100 applies to public carriers as well as private carriers").  Recently, the California Supreme Court declined to resolve this conflict in *Gomez*, 35 Cal. 4th at 1130 n.3.  It is not appropriate or necessary to decide the issue the California Supreme Court declined to reach, as this case is resolved on other grounds.

In *Booth*, participants signed a release which provided in

pertinent part

> I UNDERSTAND THAT PARTICIPATION IN BIPLANE OR OTHER
> AIRCRAFT TOURS IS A HIGH RISK ACTIVITY AND THAT SERIOUS
> INJURY OR DEATH MAY OCCUR. [¶] 8. I VOLUNTARILY ASSUME
> ALL RISK, KNOWN AND UNKNOWN, OF INJURIES, HOWEVER
> CAUSED, EVEN IF CAUSED IN WHOLE OR IN PART BY THE
> ACTION, INACTION, OR NEGLIGENCE OF THE RELEASED PARTIES
> TO THE FULLEST EXTENT ALLOWED BY LAW.

*Id.* at 662-63 (emphasis from *Booth*).  The release was found to be

a "special contract" within the meaning of section 2174.  Here,

the release similarly transferred the risk of engaging in the

dangerous activity of snowmobiling to Plaintiffs, the same

conclusion is appropriate.  *See also Saenz*, 226 Cal. App. at 764

(holding "[t]here is no public policy in California opposing

private, voluntary transactions in which one party, for a

consideration, agrees to shoulder a risk which the law would

otherwise have placed upon the party.")

Defendant's motion for summary judgment as to common carrier

liability is GRANTED on the ground that any carrier liability was

validly released, except as to gross negligence.


D.   <u>Gross Negligence Claim</u>

Defendant moves for summary judgment on Plaintiffs' gross

negligence claim, arguing that the record contains absolutely no

evidence to support a finding of gross negligence.

Plaintiffs correctly point out, and Defendant concedes, that

the Participant Agreement cannot waive grossly negligent conduct.

In *City of Santa Barbara v. Superior Court of Santa Barbara

County*, 41 Cal. 4th 747, 751 (2007), the court considered the

issue of whether an operator of recreational facilities may

28

release liability for its grossly negligent conduct.  *Id.* at 750.
The court held that as a matter of public policy, release
agreements waiving liability for future gross negligence are
unenforceable.  *Id.* at 777.  In light of *City of Santa Barbara*,
the Participant Agreement does not bar Plaintiffs' gross
negligence claim.[7]

A defendant's conduct rises to the level of gross negligence
when his or her conduct embodies "either a 'want of even scant
care' or 'an extreme departure from the ordinary standard of
conduct.'"  *Id.* at 754.  In order to survive Defendant's motion
for summary judgment, Plaintiffs must provide some evidence
indicating that Hosking demonstrated a "want of even scant care"
or exercised "an extreme departure from the ordinary standard of
conduct."

MSA has a policy of not taking their snowmobilers to areas
where they may become airborne.  Hosking testified that he was
not airborne when he went over the windridge that injured Mrs.
Lewis.  Hosking Depo. at 82.  However, at least one witness
testified that Hosking became airborne on at least one occasion:

> Q: Do you remember going off the jump or the
> incline or whatever you call it, the
> windridge, where she was injured?  Do you
> remember what it was like to go over that?
>
> A: Yes, because we had all gone over the same
> one unless she went over a different one, but
> I think we went over the same ones.
>
> Q: Okay.
>
> A: I saw the guide go over...

---

[7] The Participant Agreement does not purport to release
grossly negligent conduct and only refers to ordinary negligence.

> Q: Did you, <u>on all three of these jumps</u>, two
> or three, did your snowmobile come off the
> ground completely on all of them?
>
> A: Uh-huh.
>
> Q: Is that a "Yes"?
>
> A: Yes.
>
> Q: Were you trying to keep your snowmobile
> off the ground, is that something you wanted
> to do?
>
> A: I might have.  This is really — Let's see
> if I can do this. ... <u>I tried to follow the
> guide and he got more air than I did</u>.  He
> obviously has done this before.

Singleton Depo. at 15, 16, 35 (emphasis added).

The witness further testified that "we went off trail and went over either two or three jumps before we stopped and he [Hosking] looked back."  Singleton Depo. at 25.  Viewing the facts in a light most favorable to Plaintiffs, there is evidence that could support a finding that Hosking deliberately and without warning led the group over at least one terrain variation that caused Hosking and other members of the group to go airborne in violation of MSA policy.  There is no evidence to suggest that Hosking stopped and warned the group about becoming airborne or the attendant risk, after he allegedly became airborne.  Going airborne is sufficiently riskful that MSA has a policy against the activity.  Deliberately ignoring and violating its own rule could support a finding of reckless disregard of known risks amounting to gross negligence.  Plaintiffs have sufficiently raised a genuine issue of material fact as to whether Hosking exercised "an extreme departure from the ordinary standard of conduct" by taking the group over windridges that caused him and

30

multiple snowmobilers to become airborne.

Defendant's motion for summary judgment as to this claim is DENIED.


**E.   Loss of Consortium Claim**

"A cause of action for loss of consortium is ... dependent on the existence of a cause of action for tortious injury to a spouse." *Hahn v. Mirda*, 147 Cal. App. 4th 740, 746 (2007). "[I]t stands or falls based on whether the spouse of the party alleging loss of consortium has suffered an actionable tortious injury." *Id.*  Here, Mr. Lewis bases his loss of consortium claim based on the injuries sustained by Mrs. Lewis.  Since, Mrs. Lewis' gross negligence claim survives summary judgment, Mr. Lewis' claim for loss of consortium also survives, only as to this claim.

Defendant's motion for summary judgment on the loss of consortium claim is DENIED.


**V.   CONCLUSION**

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED as to the negligence, common carrier, and premises liability claims and DENIED as to the gross negligence and loss of consortium.

Defendant shall submit an order consistent with this decision within five (5) days following date of service by the clerk.

1

IT IS SO ORDERED.

2

**Dated:    February 19, 2009           /s/ Oliver W. Wanger    **
                                         UNITED STATES DISTRICT JUDGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28